[Civ. No. 23204.   First Dist., Div. Three.   Sept. 28, 1966.]

GEORGE E. SWEENEY, Plaintiff and Respondent, **v.** STATE PERSONNEL BOARD et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, John Fourt and Robert Burton, Deputy Attorneys General, for Defendants and Appellants.

Kopp & Skinner, Quentin L. Kopp and Vivian Hannawalt for Plaintiff and Respondent.

DEVINE, J.—Respondent was awarded a judgment of mandate ordering the State Personnel Board to restore him to a position as assistant counsel with the Secretary of State, from which he had been discharged, and to compensate him for loss of pay. The board and its members appeal. Following the appeal, the trial court made a special order that the appeal should not operate as a stay. The board and its members appeal from this special order. The District Court of Appeal granted supersedeas, and respondent's petition for hearing in the Supreme Court from granting of the writ of supersedeas was denied, so that the effect of the special order was nullified but the appeal from it remains.

The Secretary of State had found fault with the work of respondent, an attorney, in a single respect, namely, that he did not produce enough work per day. The formal charge was inefficiency, a cause for discharge recognized, though not defined, in section 19572, subdivision (c) of the Government Code.

On September 18, 1961, respondent became a member of the legal staff of the Secretary of State. The staff has to do chiefly with four kinds of documents filed in connection with corporate enterprises: certificates of merger and consolidation, certificates of amendment, certificates of dissolution, and articles of incorporation. The last category presented the least complicated problems. At first, respondent was assigned the duties of processing articles of incorporation, answering inquiries by telephone and letter about such articles, and occasionally reviewing other kinds of documents.

After 29 months as associate counsel, respondent was suspended and demoted to the rank of assistant counsel. This disciplinary action was prompted by the respondent's failure to keep current with his work. It was charged that his reviewing of the articles of incorporation was extremely slow, and he permitted a large backlog to accumulate. Respondent sought and received a hearing, which resulted in a decision affirming respondent's demotion but disapproving his suspension.[1]

Respondent returned to work in his new position as assistant counsel on February 3, 1964. Just after his return, he received a letter from Mr. Ralph Martig, the senior counsel,

---

[1] In this earlier proceeding, on application of respondent, rehearing was granted on the ground of newly acquired evidence.

stating what his duties as assistant counsel would be. The letter stated that the respondent's basic duty, that of determining the acceptability for filing of articles of incorporation, was to remain the same as before. The former practices of initialing acceptable articles, listing the defects in those not acceptable, noting further steps necessary for incorporation, and giving preference to articles marked "urgent" were likewise to continue as before. However, respondent was not to make or receive telephone calls (except interoffice calls), nor was he to confer personally with attorneys who appeared at the office to discuss articles they had submitted. Respondent was not to engage in correspondence regarding submitted articles. The concluding paragraph of the letter stated: "It is the opinion of the undersigned that you should be able to examine at least 75 documents per work day and that this is a minimum standard."

Respondent remained in the employ of the Office of the Secretary of State from February 3, 1964, to March 6, 1964. During that period his work output fell far below the standard of 75 articles set in the letter of Mr. Martig, to an average of about 34 a day. Mr. Martig determined that the respondent should be dismissed for inefficiency, and the Secretary of State concurred. Although the officer at the administrative hearing did not agree that sufficient facts existed to dismiss respondent for inefficiency, the State Personnel Board in its review of the matter reversed the decision of its hearing officer and approved respondent's dismissal.[2]

The evidence shows that before establishing the 75-articles-a-day standard, Martig had conferred with Mr. Fred Vogel, the most experienced of the three associate counsel on the legal staff. Vogel had been appointed associate counsel in September of 1959. At the time the instant controversy arose, Vogel was not processing articles of incorporation, but during the 21-

[2]In its opinion the board stated: "While the evidence does not establish that appellant should have examined precisely 75 documents per day as a minimum, the evidence does establish, and it is found, that appellant's output of work should have been substantially greater than that found in Finding VI. Appellant is an experienced attorney with well over two years' experience doing this particular type of work and except for minor interruptions was in a position to devote full time to reviewing documents. Also, appellant was required to do nothing more than note the defects observed, with other employees taking care of any problems that might arise in connection with the documents. Under these conditions, appellant's performance in reviewing an average of only a little over four articles of incorporation per hour constitutes inefficiency within the meaning of Government Code section 19572(c) and warrants the punitive action taken."

month period from September 1959 to May 1961 examining such articles had been his main duty. During this 21-month period the Office of the Secretary of State received an average of 90 articles each working day. About one-half of these, or 45, were assigned for examination to Vogel. During this same period, Vogel was required to write letters to attorneys explaining the reasons for the withholding of filing, to answer phone call inquiries regarding the filing of articles, to meet personally with attorneys visiting the office seeking information about filing, and to answer interoffice phone calls. In the opinion of Mr. Martig, during the period Vogel and another associate counsel were processing all the articles of incorporation, the average time per day spent by each in conferring with attorneys, writing letters, and answering phone calls was two and one-half to three hours. Despite these demands on his time, during the remaining five to five and one-half hours in the day Vogel was able to process 45 articles. Vogel thus averaged between eight and nine articles an hour; had he had no interruptions and nothing but processing to do, and had he been able to maintain his hourly average throughout an eight-hour day, it may be deduced that he could have processed between 64 and 72 articles per day.

In addition, for two 10-day periods during the time he processed articles of incorporation, Vogel was assigned to process the entire office workload of about 90 articles per day. Vogel was able to examine these 90 documents daily and to keep current for each of these 10-day periods, except for a peak workload period at the end of June 1960. Moreover, in Vogel's opinion, an assistant counsel who did not have visitors to confer with, letters to write, or phone calls to receive, but who did have to handle interoffice phone calls, should be able to process at a normal pace at least 80 articles each eight-hour working day. However, in Vogel's opinion a daily workload of 90 articles, together with the interruptions just mentioned, was in excess of what an attorney should handle as a long-range program.

Mr. Martig, senior counsel, testified that prior to respondent's employment, Mr. Vogel and a woman who was not a lawyer had been able, between them, to process 85 or 90 articles a day, which would make one person's workload 45, plus handling counter jobs, letters and phone calls. He testified that when these latter duties were removed, as they were (except interoffice calls), from respondent's responsibility, 75 documents would be a reasonable load. Respondent's product

of 34 was only 75 percent, roughly, of even the 45. Martig gave it as his opinion, when he was asked on cross-examination, that the "scanning," as he called it, of articles of incorporation would take an average of five minutes.

Testimony was produced by a Deputy Secretary of State that it is of importance that the work be kept current, because whenever there is a backlog inquiries come from attorneys, causing interruptions in the normal proceedings and creating still more of a backlog.

Mr. Martig admitted that the legal staff needs additional personnel, but he testified that this was not so in the division handling articles of incorporation.

Respondent assails the figure of 75 as arbitrary, unrealistic and speculative. He argues that no one had reviewed 75 documents over an extended period; that no one else had been given a quota; that Martig did not know the average number of pages in a document; that the periods during which Martig and Vogel had done the work were a few years before respondent's tenure; and he makes other arguments of this kind.

Respondent testified that the average time for reading articles of a stock corporation is 10 or 11 minutes, and for articles of nonstock corporations, which constitute about 30 percent of the total, about 11 or 12 minutes. Respondent testified that a large number of check points devised by Mr. Martig had to be observed in the processing of each document. A few have to do with defects which, Martig testified, would not be causes for rejection. During the period following his suspension, respondent spent part of his time counting the number of words in articles of incorporation, and making spot checks because of the standard that had been set up for him at the time of his demotion.

There was presented on behalf of respondent the testimony of two experts. One, the manager of the planning department of a corporation, testified to various methods of work measurement, and called the method used by Martig a "guess." This witness offered no opinion as to the number of articles respondent could have been expected to process. The second, an industrial engineer, had gone over the work with respondent, had computed the number of mental operations required for each document, and had concluded that the average number of articles that could be processed in a day was 31.2, and that the maximum which could be done by an average person was 41. He had not interviewed other members of the staff of the Secretary of State.

The parties have cited no cases, and we know of none, in which quantity of work has been the subject of appeal from a decision of the State Personnel Board. Because there is no dispute about the actual quantity of work that was done by respondent, the question is whether the standard itself (as applied by the board) must be regarded by the court, contrary to the decision of the State Personnel Board, as being wholly unreasonable and unsupported by substantial evidence. This court cannot weigh the evidence, but must determine only if there is substantial evidence to support the board's decision. The intervening judgment of the superior court does not change the nature of this test. All legitimate and reasonable inferences must be drawn in favor of the findings of fact made by the board, not those made by the superior court. (*Martin* v. *Alcoholic Beverage Control Appeals Board,* 52 Cal.2d 238, 246 [340 P.2d 1]; *Hingsbergen* v. *State Personnel Board,* 240 Cal.App.2d 914, 916-917 [50 Cal.Rptr. 59]; *Neely* v. *State Personnel Board,* 237 Cal.App.2d 487, 489 [47 Cal.Rptr. 64]; *Lorimore* v. *State Personnel Board,* 232 Cal.App.2d 183, 186 [42 Cal.Rptr. 640]; *Tabory* v. *State Personnel Board,* 208 Cal.App.2d 543 [25 Cal.Rptr. 333].)

It would be enough for us to say that, viewing the case as a whole and giving effect to all reasonable inferences, there is substantial evidence to support the findings and decision of the board. But we shall make note of some of the considerations we have in mind:

1. There is the testimony of witnesses Martig and Vogel, who were experienced in the work and who were not shown to have animosity toward respondent.

2. The legal staff of the Secretary of State is small, and the work is specialized, so that large scale sampling is not possible.

3. The State Personnel Board makes it plain in its decision that it did not hold respondent to 75 documents a day but found that his output should have been ''substantially greater'' than it was.

4. The fact that respondent's performance for the last nine full days of his employment never exceeded 39 and averaged about 30, with no intimation that improvement would follow, tends to show that respondent sought acceptance of his own output and no more. The fact that he was engaged in computing the details gives evidence that his contention was to be as it has been all along, that his output, although substantially lower than that of others, must be accepted as adequate.

5. The experts produced by respondent had not themselves performed work of the kind involved in the case. They admitted the difficulty of establishing a standard. The board need not have accepted their testimony against that of the witnesses who had experience with the particular job. One of the experts had testified that there is a 99 percent probability that fewer than 41 documents a day could be processed by an average person. This figure actually had been exceeded by workers in the office even when a considerable amount of their day was taken with other work.

6. Respondent notes that the Secretary of State had not asked the State Personnel Board to set work standards pursuant to Government Code section 19300. But this statute merely provides that the board shall assist and encourage state agencies to establish standards of performance for each class of position. Prior action by the board in the matter of standards is not required as a legal condition for dismissal. Nor can it be thought that the board as an administrative matter regards it so, because this same board ruled against respondent.

The judgment directing issuance of writ of mandate and the special order for immediate reinstatement are reversed.

Draper, P. J., and Salsman, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 23, 1966.