[Civ. No. 17939. Fourth Dist., Div. Two. Jan. 16, 1979.]

JAMES M. CRAMER, as District Attorney, etc.,
Plaintiff and Appellant, v.
VERNON RAYMOND MORRISON, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, *Chief Assistant Attorney General*, Daniel J. Kremer, Jay M. Bloom and M. Howard Wayne, *Deputy Attorneys General*, for Plaintiff and Appellant.

Covington & Crowe, Robert F. Schauer and Robert E. Dougherty for Defendant and Respondent.

## OPINION

**TAMURA, Acting P. J.**—The central issue on this appeal is whether the results of an human leucocyte antigen (HLA) test are admissible to establish parentage in a civil paternity suit.[1]

At the commencement of trial, defendant made an oral motion *in limine* to exclude the results of an HLA paternity test performed by Dr. Paul Terasaki of the UCLA School of Medicine on blood samples taken from the mother, the child and defendant.[2] Defendant's position was that given the existence of a valid scientific basis for the test and accepting Dr. Terasaki's qualifications to perform it, the results were nevertheless inadmissible because (1) California law precludes use of blood test results to prove paternity and (2) the results are based on probabilities so that the prejudicial effect of the evidence would outweigh its probative value.

At the hearing on the motion, plaintiff called Dr. Terasaki who testified: The HLA test is not the typical test based on red blood cell grouping, such as those in common use in California to exclude men from parentage.[3] The test is based on tissue typing of the white blood

---

[1]The action was filed by the district attorney under former Civil Code sections 231 and 248. The authority of the district attorney to bring such action is now contained in Civil Code section 7006, subdivision (f).

[2]The motion *in limine* for a ruling on the admissibility of evidence has been recognized as an appropriate way of resolving the issue of admissibility, particularly where it relates to the admissibility of an opinion of an expert on a material issue in the case. (*People* ex rel. *Dept. Pub. Wks.* v. *Curtis,* 255 Cal.App.2d 378, 382, fn. 1 [63 Cal.Rptr. 138]; *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed,* 215 Cal.App.2d 60, 68 [29 Cal.Rptr. 847].)

[3]The Landsteiner classification of blood groups and its subsequent improvements are in general use to prove nonpaternity. (See Witkin, Cal. Evidence (2d ed. 1966) § 657, p. 618.) For detailed descriptions of these tests and assessments of their reliability, see McCormick, Handbook of the Law of Evidence (1954) sections 177-178, pages 377-383; Annotation (1946) 163 A.L.R. 939, 940-943; Annotation (1956) 46 A.L.R.2d 1000, 1002-1005.

cells. He has been working in the field of tissue typing for 20 years and has been using the HLA test for about 15 years in tissue typing for kidney transplantation. The test has gained wide acceptance for kidney transplantation and is universally used for that purpose in the United States and Europe. There is a great difference between red blood cell testing and HLA tissue typing. Red blood cell grouping involves only a small number of variables or factors, so that while a man may be conclusively ruled out as a father on the results of such tests, proof that he *is* the father is very inconclusive, ordinarily involving only a 50 to 60 percent probability that the man is the father. HLA testing, on the other hand, involves a much larger number of factors, antigens in the white blood cells, so that proof of parentage is much more conclusive, usually involving a 98 percent probability that the man is the father. Based on the results of HLA tests performed on the blood taken from the child, mother and defendant in this case, Dr. Terasaki determined that there was a 98.3 percent probability that defendant was the father, i.e., only 1.7 percent of the population could be the father of this child and defendant was within that group. The doctor has been using the test for over two years to determine parentage in some 260 cases, and has testified in court as an expert witness based upon the results of the test. He noted that in Europe the HLA test has been used for a much longer time to prove paternity.

At the conclusion of the hearing, the judge ruled that while available data indicated the test was reliable, under the present state of the law in California, the evidence was inadmissible and further that there was a possibility that statistical evidence of this nature would have a prejudicial effect on the jury which would outweigh its probative value. The motion *in limine* was therefore granted and the case proceeded to trial before a jury.

The evidence adduced at trial may be briefly summarized as follows:

Defendant was named as father at the time of birth and the child has used his name at all times since. However, defendant has never admitted parentage or acted as a father toward the child. The mother testified that she had sexual relations with defendant during the likely time of conception of the child and that she had relations with no one else during that time. Defendant introduced evidence that he was away in the military during part of the time when conception might have occurred and also disputed the mother's testimony as to when she first missed a

menstrual period. He did not deny having intercourse with the mother, but contended that she also had relations with other men during that time. Because of the variable factors inherent in the gestation process, expert testimony on probable time of conception was not conclusive. The child was shown to the jury for the purpose of comparing her appearance with that of the alleged father. The chief similarity noted in the record was eye color. On the foregoing evidence, the jury returned a verdict for defendant and judgment was entered decreeing that defendant is not the father of the child. Plaintiff appeals from the judgment.

The sole issue concerns the propriety of the court's ruling on the motion *in limine*. Plaintiff contends the judge erred in ruling that California law forbids use of the results of tests such as the HLA to prove parentage. Defendant seeks to support the ruling below on the two grounds on which the motion *in limine* was made and granted on the further ground that plaintiff failed to show that reliability of the HLA test to prove paternity has attained general acceptance in the relevant scientific community. Pursuant to the ensuing discussion, we conclude that the court erred in granting the motion *in limine* on the grounds on which the motion was made and further conclude that the order cannot be upheld on the theory that plaintiff failed to adduce sufficient evidence that the HLA test has gained general acceptance in the relevant medical field as proof of paternity.

## I

We first address the basic question whether California law precludes use of the results of the HLA test to prove paternity.

Under Evidence Code section 351,[4] "all relevant evidence is admissible" except as otherwise provided by statute. California has adopted a broad standard of relevancy. Section 210 provides: " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." In addition, our courts have consistently declared the general test of relevancy to be whether the evidence tends logically, naturally, and by reasonable inference to prove or disprove a material issue. (*People* v. *Jones,* 42 Cal.2d 219, 222 [266 P.2d 38]; *People* v. *Warner,* 270 Cal.App.2d 900, 907-908 [76 Cal.Rptr. 160]; *Firlotte* v. *Jessee,* 76 Cal.App.2d 207, 210 [172 P.2d 710].)

[4]Except as otherwise indicated, all code references herein are to the Evidence Code.

Apart from the possibility of exclusion of the HLA test by a specific statute and assuming its general acceptance in the scientific community as a reliable test for paternity, the results of the test are clearly probative and therefore relevant in an action to establish paternity. They have a tendency to prove the fact of paternity, which is the central issue in such actions. In fact, in the instant case, they reveal a very high probability that defendant is the father of the child in question.

Defendant, however, contends that evidence of the HLA test results is statutorily inadmissible by reason of the Uniform Act on Blood Tests to Determine Paternity enacted in California in 1953.[5] When the Legislature adopted this measure, it retained the provision of the model act which provided that blood tests could serve as conclusive evidence of an alleged father's nonpaternity,[6] but it omitted the part which allowed admission of the results of blood tests to show the possibility of paternity.[7] Defendant urges that this omission indicates that the Legislature intended to preclude the use of evidence of tests such as the HLA test to establish the paternity of an alleged father. We do not so interpret this bit of legislative history.

In our opinion, the drafters of the uniform act did not have in mind tests of the nature of the HLA. Initially, the terminology which the statute employs in referring to blood tests—"blood types"[8]—is that commonly applied to the Landsteiner series of red cell blood grouping tests.[9] This terminology is also employed in the omitted part of the model act.[10] The Landsteiner series enjoyed currency when the uniform act was adopted

[5]The statute is now contained in sections 890-897.

[6]Section 895 provides: "If the court finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence."

[7]9 Uniform Laws Annotated, Uniform Act on Paternity, section 10 provides in pertinent part: "If the experts conclude that the *blood tests* show the possibility of the alleged father's paternity, admission of this evidence is within the discretion of the court, depending upon the infrequency of the *blood type*." (Italics supplied.)

[8]Section 893 provides: "The tests shall be made by experts qualified as examiners of *blood types* who shall be appointed by the court. The experts shall be called by the court as witnesses to testify to their findings and shall be subject to cross-examination by the parties. Any party or person at whose suggestion the tests have been ordered may demand that other experts, qualified as examiners of *blood types*, perform independent tests under order of the court, the results of which may be offered in evidence. The number and qualifications of such experts shall be determined by the court." (Italics supplied.)

[9]See footnote 3, *ante*.

[10]See footnote 7, *ante*.

in California[11] and had been endorsed by the American Medical Association as sufficiently accepted within the scientific community to be legally valid only the year before the act's adoption.[12]

Second, California courts have treated the Landsteiner series as the standard blood tests to prove nonpaternity. In *Huntingdon* v. *Crowley,* 64 Cal.2d 647 [51 Cal.Rptr. 254, 414 P.2d 382], the Supreme Court, in upholding the exclusion of the results of the Kell-Cellano blood test to disprove paternity, characterized the ABO, MN, and Rh tests as the " 'standard' systems of blood grouping" and stressed that the Kell-Cellano blood grouping test was still in a stage of experimentation and development. (*Id.,* at p. 653.) In a recent Court of Appeal decision, *Dodd* v. *Henkel,* 84 Cal.App.3d 604 [148 Cal.Rptr. 780], the court held that results of blood grouping or blood type tests were not admissible to prove paternity, partly on the ground that the above mentioned omission from the Uniform Act on Blood Tests to Determine Paternity was intended to preclude use of the results for that purpose. (*Id.,* at pp. 609-610.) The court indicated that its decision referred to the "generally acceptable standard classifications [of blood grouping tests] commonly referred to as ABO, MN and Rh-Hr." (*Id.,* at p. 608, fn. 4.)

Finally, commentators on California law who have interpreted the omission from section 895 to mean that blood test results cannot be used as proof of paternity have indicated that the Landsteiner classification of blood groups is the test referred to by the statute.[13] As Dr. Terasaki's testimony shows, the HLA test is not one of the Landsteiner series, nor is it even a red cell blood grouping test. It involves tissue typing of the white

---

[11]See Annotation (1946) 163 A.L.R. 939, 940-943; McCormick, Handbook of the Law of Evidence (1954) sections 177-178, pages 377-383; and Annotation (1956) 46 A.L.R.2d 1000, 1002-1005, for a sequential history of development and acceptance of these tests in the medical and legal communities. ،

[12]Davidsohn et al., *Report of the Committee on Medico-Legal Problems* (1952) 149 J.A.M.A. 699.

[13]Witkin, California Evidence (2d ed.) section 657, page 618: "The Landsteiner classification of blood-groups, as improved by later scientific studies, is the basis of a widely recognized test of *nonpaternity* of a person asserted to be the father of a child. The medical profession generally regards this test, when properly conducted, as practically conclusive on that issue." (Original italics.)

Witkin, California Evidence (2d ed.) section 660, page 620: "The blood-grouping test is now considered conclusive in its showing of nonpaternity (Ev.C. 895 . . .). It is also highly persuasive in some situations (where the blood type is rare) as an indication of probable paternity. The Uniform Act, § 4, contains the provision that, if the experts find a possibility of the alleged father's paternity, this evidence may be admitted in the discretion of the court, 'depending upon the infrequency of the blood type.' . . .

"The foregoing provision was without precedent in statute or case law, and was deleted from the California section. . . ."

blood cells and results in far higher probabilities of paternity than those yielded by any of the blood grouping tests.[14]

For the foregoing reasons, we do not interpret the provisions or omissions of section 895 to preclude admissibility of HLA test results to prove paternity.[15] Indeed, section 897 expressly provides that nothing in the chapter on the Uniform Act on Blood Tests to Determine Paternity "shall be deemed or construed to prevent any party to any action from producing other expert evidence on the matter covered by this chapter; . . ."

Defendant also maintains that California's enactment of the Uniform Parentage Act[16] in 1975 renders the HLA tests inadmissible to establish fatherhood. Defendant argues that since the Legislature left out the provision of the model act which, like the model blood test act, allowed

---

Jefferson, California Evidence Benchbook (1972) section 20.6, page 244:

"*Blood-grouping test for nonpaternity.* Legislative recognition of the scientific acceptance of the principle that blood-grouping tests are reliable to establish nonpaternity is incorporated in Evid C §§ 890-897. These sections constitute an enactment of the Uniform Act on Blood Tests to Determine Paternity. . . .

"Although admissible to establish nonpaternity, blood tests are *not* admissible to establish paternity. They are irrelevant for this latter purpose, because they simply show that any man with the particular blood type is capable of being the father." (Original italics.)

See also 1 The California Family Lawyer (Cont.Ed.Bar 1961) section 18.39, page 754: "The presence or absence of these blood factors is determined by laboratory tests based on known groupings of human blood. Of these groupings, the most common is the A-B-O system, followed by the M-N system, the Rh system and, less frequently used, the Kell, Lutheran, Secretion, Duffy, Kidd, and other systems."

[14]For a history of the isolation of white blood cell factors, see Larson, *Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond* (1973-74) 13 J. Fam. L. 713, 744-748.

[15]Plaintiff contends that the omission of the model act provision does not indicate that the Legislature necessarily meant to preclude such use of standard blood grouping test results in all instances. He cites two cases, *Hodge* v. *Gould,* 274 Cal.App.2d 806 [79 Cal.Rptr. 245], and *Foster* v. *Gray,* 203 Cal.App.2d 434 [21 Cal.Rptr. 429], in support of his thesis. Neither of these cases, however, is authority for admission of standard blood test evidence to prove rather than disprove parentage. In *Hodge,* the trial judge made an erroneous ruling that in the absence of conclusive evidence of nonparentage, a presumption of paternity arose. The court reversed, holding that "no inference or presumption of paternity arises from the mere fact that such tests fail to exclude him" (*id.,* at p. 808) and made no further comment on admissibility of such evidence to help establish paternity. *Foster* involved a paternity suit in which the mother was incompetent and unable to testify. A large amount of circumstantial evidence was used to establish paternity of the alleged father, among which was the fact that a blood test showed there was a possibility that defendant was the father. The court stressed, however, that this factor "simply eliminat[ed] one possible defense." (*Id.,* at p. 436.) Thus, the evidence was not used as part of the proof of paternity, but only to show that defendant had no conclusive defense to parentage based on a blood test.

[16]Civil Code, sections 7000-7018.

the use of blood test evidence to prove paternity, it meant to preclude the use of blood tests of any kind for this purpose. Comparison of the model act with California's statute reveals, however, that the Legislature left out the entire model code section dealing with evidence relating to paternity. The omitted section permits the inclusion of evidence of sexual intercourse, duration of pregnancy, other medical and anthropological evidence, as well as blood test evidence, to prove paternity.[17] If we were to accept defendant's interpretation of the Legislature's omission of this section, we would have to say that all these other types of evidence, as well as blood test results, must be excluded from paternity suits. A more plausible explanation of the Legislature's omission is that it felt the evidentiary problems of paternity were already adequately covered by the Evidence Code, other statutes and case law.

Even if we were to accept defendant's contention that omission of the blood test section from the Uniform Parentage Act indicates that the Legislature meant specifically to exclude blood test evidence to prove parentage, we would interpret the omission to refer not to tests such as the HLA, but to the standard Landsteiner blood grouping tests. In 1975, the Landsteiner tests were still the standard tests for nonpaternity.[18] Expert testimony in this case shows that the HLA test was not in use for paternity testing in this state in 1975. And *Dodd* v. *Henkel, supra,* 84 Cal.App.3d 604, which based its decision that blood tests are not admissible in California to prove paternity partly on this omission in the Uniform Parentage Act, assumes that the blood tests referred to by the act are the Landsteiner series. (*Id.,* at p. 608, fn. 4, 610.)

We conclude that California law does not compel exclusion of the results of the HLA test to prove paternity.

[17]Uniform Laws Annotated, Supplement 1974-1977, Uniform Parentage Act, section 12 provides:

"Evidence relating to paternity may include:

"(1) evidence of sexual intercourse between the mother and alleged father at any possible time of conception;

"(2) an expert's opinion concerning the statistical probability of the alleged father's paternity based upon the duration of the mother's pregnancy;

"(3) blood test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity;

"(4) medical or anthropological evidence relating to the alleged father's paternity of the child based on tests performed by experts. If a man has been identified as a possible father of the child, the court may, and upon request of a party shall, require the child, the mother, the man to submit to appropriate tests; and

"(5) all other evidence relevant to the issue of paternity of the child."

[18]See Lee, *Current Status of Paternity Testing* (1975) 9 Fam. L. Q. 615, 624; Polesky & Krause, *Blood Typing in Disputed Paternity Cases—Capabilities of American Laboratories* (1976) 10 Fam. L. Q. 287, 291.

## II

■ We turn to the second ground on which the trial judge based his ruling; namely, that the prejudicial effect of the "statistical results" would outweigh their probative value. Assuming, as did the trial judge, the existence of valid scientific bases for the statistical conclusions drawn from the tests, exclusion of the results on the stated ground constituted an abuse of discretion.

As we indicated in *Bodenschatz* v. *State Personnel Board,* 15 Cal.App.3d 775, 781 [95 Cal.Rptr. 471], the Supreme Court in *People* v. *Collins,* 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176], did not foreclose all use of statistical compilations as evidence to establish a fact. In · reversing the conviction in *Collins,* the Supreme Court "established restrictions on the assignment of numerical values to the probability of encountering a given set of circumstances in a random population, and the use to which such coefficients might be put." (*Bodenschatz* v. *State Personnel Board, supra,* 15 Cal.App.3d 775, 781. See Finkelstein & Fairley, *A Bayesian Approach to Identification Evidence* (1970) 83 Harv.L.Rev. 489; Kaplan, *Decision Theory and the Factfinding Process* (1968) 20 Stan.L.Rev. 1065.) The HLA test interpretations are not based on arbitrarily assigned numerical probability values or on a statistical theory unsupported by the evidence. Instead, they are based upon objectively ascertainable data and a statistical theory based upon scientific research and experiment. The results established a 98.3 percent probability that defendant was the father of the child. As the court aptly stated in *People* v. *Slone,* 76 Cal.App.3d 611, 625 [143 Cal.Rptr. 61], in upholding the admissibility of a recently developed technique of bite mark identification, "[t]here is a probability factor in even the most carefully structured scientific inquiry; seldom is it possible to exclude all possible chance for error in human endeavor. But there is no requirement in our law that the admissibility of scientific-test evidence must be predicated on a 100 percent degree of accuracy."

■ Deciding whether relevant evidence should be excluded under section 352 because the dangers of undue prejudice to the other party outweigh the probative value of the evidence involves a delicate weighing process. "The more substantial the probative value of relevant evidence, the greater must be the danger of prejudice to an adverse party, in order

to justify a finding that the probative value is substantially outweighed by the danger of undue prejudice." (Jefferson, Cal. Evidence Benchbook (1972) § 22.1, p. 289.) In the case at bench, we conclude that the trial court erred in exercising its discretion to exclude the highly probative results of the HLA test. "Paternity is now determined by the court on extraordinarily flimsy evidence for which there is no quantitative measure of value. . . . Rather than relying on such evidence, the law should not ignore readily obtainable genetic evidence that can provide a precise and objective basis for deciding such an important question as the paternity of a child." (Beautyman, *Paternity Actions—A Matter of Opinion or a Trial of the Blood?* (April 1976) J. Legal Med. 17, 20-21.)

■ We are not aware of any public policy which would require exclusion of highly probative scientific evidence on the issue of paternity in the absence of a statutory mandate. On the contrary, all the policy considerations advanced by California commentators and case law argue for broad inclusion of such evidence in paternity proceedings. These considerations include protecting children from the stigma of illegitimacy, preservation of the family, and insuring that individuals rather than the government bear responsibility for child support. (See, e.g., *Kusior v. Silver,* 54 Cal.2d 603, 619 [7 Cal.Rptr. 129, 354 P.2d 657]; *California's Tangled Web: Blood Tests and the Conclusive Presumption of Legitimacy* (1968) 20 Stan.L.Rev. 754, 758; *The Use of Blood Tests to Prove Paternity in California* (1969) 3 U.S.F. L.Rev. 297, 309-310.) Further, we note that the recent and growing recognition of the right of illegitimates to equal protection with legitimates before the law has served to heighten the significance of paternity litigation throughout the United States. (See *Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam. L. Q. 247, 249-251; Polesky & Krause, *Blood Typing in Disputed Paternity Cases—Capabilities of American Laboratories* (1976) 10 Fam. L. Q. 287-288.)

### III

■ Finally, we address defendant's contention that the order granting the motion to exclude the HLA test results should be upheld because plaintiff failed to adduce sufficient evidence that the test had been generally accepted in the scientific community as a reliable test for paternity. For reasons which we shall explain, the contention must be rejected.

■ In *People* v. *Kelly,* 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240], our Supreme Court reaffirmed its adherence to the traditional test enunciated in *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013, 1014, for the admissibility of expert testimony based upon a new scientific technique. Under the guidelines laid down in Frye, there must be a preliminary showing of general acceptance of a new technique in the relevant scientific community; the witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject; and the proponent of the evidence must demonstrate that correct procedures were used in the particular case. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30.)

In the case at bench, however, defendant did not base his motion *in limine* on the ground that the HLA test had not attained general acceptance in the scientific world. On the contrary, in making his motion defendant stated that giving plaintiff every benefit as "to the scientific value of the test" and accepting the "qualifications of the doctor," this type of evidence was inadmissible under California law to prove paternity. Nor did the trial judge base his ruling on the ground now asserted. In making his ruling, the judge commented that based upon the testimony of Dr. Terasaki "it does seem that the testing is reliable insofar as they have data to—on which they have applied the results of their testing" but nevertheless granted the motion to exclude on the two grounds we have discussed earlier in this opinion; namely, that California law precludes use of such evidence to prove paternity and on the further ground that the prejudicial effect "of the statistical results" outweighs the probative value of the evidence.

■ On the basis of the foregoing record, the ruling below cannot be upheld on the ground that plaintiff failed to adduce sufficient evidence that the HLA test is generally accepted in the relevant scientific community as proof of paternity. (*Bundy* v. *Sierra Lumber Co.,* 149 Cal. 772, 776 [87 P. 622]; *People* v. *Watson,* 75 Cal.App.3d 384, 401 [142 Cal.Rptr. 134]; *People* v. *Modell,* 143 Cal.App.2d 724, 730-731 [300 P.2d 204].) ■ An objection must specify a reasonably definite statement of the ground or grounds so that the judge may properly pass on the objection and the adversary may have an opportunity to remedy, if possible, any deficiency. (*Bundy* v. *Sierra Lumber Co., supra,* 149 Cal. 772, 776; McCormick, Handbook of the Law of Evidence (1954) § 52, p. 117.) Here, defendant not only failed to specify the ground now asserted on appeal, he specifically indicated to the court that his motion was not

based on that ground. He is, therefore, precluded from raising that issue on appeal.

■     Although there is a principle of appellate review that a ruling, if correct in law, will not be disturbed on appeal merely because it was based upon a wrong reason if it was right upon any theory of law applicable to the case (*D'Amico* v. *Board of Medical Examiners*, 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; *Davey* v. *Southern Pacific Co.*, 116 Cal. 325, 329 [48 P. 117]), that principle is inapplicable where the theory not advanced in the trial court and on which the correctness of the ruling depends involves controverted questions of fact or mixed questions of law and fact. A party may not for the first time on appeal present a new theory that ". . . contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial. . . ." (*Panopulos* v. *Maderis*, 47 Cal.2d 337, 341 [303 P.2d 738]; *City of Newport Beach* v. *Sasse*, 9 Cal.App.3d 803, 812 [88 Cal.Rptr. 476]; *Pacific Gas & E. Co.* v. *Peterson*, 270 Cal.App.2d 434, 439 [75 Cal.Rptr. 673].) A new theory may be advanced for the first time on appeal only where it involves "a legal question determinable from facts which are not only uncontroverted in the record but could not be altered by the presentation of additional evidence." (*City of Newport Beach* v. *Sasse, supra*, 9 Cal.App.3d 803, 812; *Marsango* v. *Automobile Club of So. Cal.*, 1 Cal.App.3d 688, 694 [82 Cal.Rptr. 92].)     ■     Here, the question whether the reliability of the HLA test to prove paternity has attained general acceptance in the scientific community presents a mixed question of fact and law to be determined from the testimony of qualified experts in the field, by reference to legal and scientific publications and journals on the subject, and from relevant judicial decisions. (*People* v. *Kelly, supra*, 17 Cal.3d 24, 32; *People* v. *Palmer*, 80 Cal.App.3d 239, 252 [145 Cal.Rptr. 466].) Defendant, having withdrawn the issue of general acceptance from his motion *in limine* may not now assert that the ruling below may be sustained on the ground plaintiff failed to adduce sufficient evidence upon it. Assuming for the moment that the record is deficient in respect to proof of general acceptance in the scientific community, the deficiency is manifestly one which could be altered by the presentation of additional evidence. No doubt there are other experts who are competent to testify on the issue of general acceptance. In addition, as the Attorney General notes in his brief on appeal, there are articles in medical and legal periodicals lauding the HLA tests as an improved and reliable method for determining paternity. (*Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam. L. Q. 247; Polesky & Krause, *Blood Typing in Disputed*

*Paternity Cases—Capabilities of American Laboratories* (1976) 10 Fam. L. Q. 287; Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing* (1977-1978) 16 J. Fam. L. 543.) ■ Such writings may be considered by courts in evaluating the reliability of new scientific techniques. (*People* v. *Kelly, supra*, 17 Cal.3d 24, 35.) Thus, had the issue been raised below, plaintiff could have adduced additional evidence on the issue of general acceptance and reliability of the HLA test to prove paternity as well as additional evidence pertaining to the qualifications of Dr. Terasaki[19] to render an opinion on that issue.

Since the issue of general acceptance by the relevant scientific world was withdrawn by defendant and, therefore, not fully litigated in the trial court, we believe it would be inappropriate for us as a reviewing court to attempt to determine and proclaim on the record before us, whether the HLA test has gained general acceptance in the scientific community as proof of paternity. As the Supreme Court observed in *People* v. *Kelly, supra*, 17 Cal.3d 24, a published appellate decision upholding the admissibility of evidence based on a new scientific technique would establish a precedent that would "control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Id.,* at p. 32.) Accordingly, because of its far-reaching implications, an appellate decision on whether the HLA test has gained general acceptance in the relevant scientific community should be withheld pending full and complete litigation of that issue in the trial court. Since the parties will have an opportunity to litigate that issue in the trial court on reversal and remand, we decline the invitation to resolve the issue on the record before us.

## DISPOSITION

We conclude that the court erred in granting defendant's motion *in limine* on the grounds stated and that the error requires reversal. It appears reasonably probable that absent the erroneous ruling, plaintiff

---

[19]At the hearing on the motion *in limine*, Dr. Terasaki merely gave his qualifications as a Ph.D. from UCLA, who had been working in the field of tissue typing for 20 years and was a member of the WHO nomenclature committee since its inception and had been involved in early workshops with other experts in the field. In his brief on appeal, the Attorney General points out, as evidenced by an article in the Family Law Journal of which he requests this court to take judicial notice, that Dr. Terasaki is a professor of surgery at UCLA school of medicine, a member of the editorial board of the Journal of Immunogenetics, and the 1977 recipient of the Philip Levine Award of the American Society of Clinical Pathology for his contributions to blood grouping immunology.

could have established the foundational requirements for the admissibility of the HLA test to prove paternity and introduced the test results into evidence for that purpose.

Judgment is reversed.

Kaufman, J., and McDaniel, J., concurred.

A petition for a rehearing was denied February 1, 1979, and respondent's petition for a hearing by the Supreme Court was denied March 29, 1979.