[Civ. No. 1004.   Fifth Dist.   Mar. 27, 1969.]

AUGUST R. GUBSER, Plaintiff and Respondent, v. DEPARTMENT OF EMPLOYMENT et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, and Walter J. Wiesner, Deputy Attorney General, for Defendants and Appellants.

Evans, Jackson & Kennedy, Anthony M. Kennedy and Timothy F. Kennedy for Plaintiff and Respondent.

STONE, J.—The Department of Employment of the State of Califorina and the State Personnel Board appeal from a judgment of the superior court granting a peremptory writ pursuant to a mandamus proceeding under Code of Civil Procedure section 1094.5. The State Personnel Board found respondent Gubser guilty on two separate charges of ''inexcusable neglect of duty'' within the meaning of section 19572, subdivision (d), of the Government Code, and ordered his dismissal for each separate violation. The superior court found that one charge was not supported by the evidence and although the other charge was true dismissal was not warranted, and directed the board to reconsider the question of penalty, other than dismissal.

Respondent, as a Farm Labor Supervisor I, was in charge of the administration of four all-year farm employment offices, six seasonal offices, and the agricultural phase of five nonagricultural offices of the Department of Employment. The farm labor offices had a dual function, to find employment for laborers and to make farm laborers available to growers to meet seasonal labor needs. There were a number of employees attached to each field office who, among other things, were to report to the Department of Employment the number of laborers recruited by the particular labor office and the farms to which they were assigned. Some of these employees grossly and falsely inflated the number of placements. Gubser, as supervisor of the employees making the returns, was charged with inexcusable neglect of duty, it being charged that he knew or should have known that the reports were false. He was dismissed by the department; the State Personnel Board, following a hearing before a hearing officer, sustained the dismissal.

Only two of the findings of the appeals board are pertinent to this appeal. Finding V states that for extended periods of time the placement figures were inflated to equal or exceed budget estimates made from time to time by the manager of each individual office involved, in order to prevent a reduction in staff; that the figures were so far removed from reality that a supervisor functioning at Gubser's level should have spot-

ted the discrepancies, particularly since Gubser visited the various offices and failed to make even the elementary checks necessary to identify obvious and widespread violations which continued over an extended period of time. Based upon this Finding V, the appeals board held that Gubser's neglect of duty "to exercise reasonable supervision and control over the four offices involved is inexcusable and constitutes cause for punitive action under the provisions of Government Code section 19572 (d)," and that the punitive action of dismissal imposed by the department was proper.

In its Finding VII, the board states that approximately 100 job placements were transferred from the Sebastopol and Healdsburg seasonal offices to the Santa Rosa main office; that the transfers were made with respondent's knowledge and consent, and that although the placements themselves were legitimate the effect of transferring them to the Santa Rosa office was to deceive and mislead "those area and central office officials who might be concerned with the budgetary requirements of the Santa Rosa office." For this "inexcusable neglect of duty," the appeals board again upheld the department's order of dismissal.

The trial court found there was no substantial evidence in the record to support Finding V, and although Finding VII was substantiated by the evidence, the appeals board abused its discretion in sustaining the department's dismissal on this ground. The court directed the board to reconsider the question of penalty. This appeal followed.

Preliminarily, we are confronted with an interpretation of the term "inexcusable neglect of duty." Stated abstractly in Government Code section 19572, subdivision (d), as one of the several grounds for dismissal, the term is vague, to say the least. Respondent contends the Supreme Court's definition of "neglect of duty" found in *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974], is controlling. The Supreme Court said, at page 414: "The phrase 'neglect of duty' has an accepted legal meaning. It means an intentional or grossly negligent failure to exercise due diligence in the performance of a known official duty."

The statute modifies the term "neglect of duty" by the word "inexcusable," which Webster's New Collegiate Dictionary defines as "Not excusable; not admitting excuse or justification." Even with the benefit of these expository statements the expression remains an abstraction until viewed in the light of the facts surrounding a particular case. One

difficulty in relating the terminology of the code section to the facts of this case is presented in respondent's argument that a finding of inexcusable neglect must be grounded on an affirmative showing of his awareness of a duty, and an intent to neglect that duty. Although he does not specifically say so, the substance of respondent's argument is that direct evidence is necessary to support a finding of an intentional omission to perform a duty. Were we to agree, the effect would be to prevent the use of circumstantial evidence to prove intent or inexcusable neglect of duty. Yet as a practical matter, absent admissions of the fact, an intentional or inexcusable omission usually can be proved only by circumstantial evidence. Moreover, in determining whether an inference is supported by the evidence, facts need not be viewed as isolated fragments but should be considered as a whole.

In viewing the facts, it is essential that we keep in mind the purpose for reporting agricultural employment statistics. Crop harvesting is seasonal; consequently most of the workers are migrant laborers who go from one part of the state to another, and even from one state to another, as the crops mature. The demand for workers varies from large numbers at the peak of the season, to none at all after the harvest. It is the purpose of the Unemployment Act to facilitate the migration of these laborers from cities and towns to various rural areas at harvest time, and refer them to employer-farmers for placement, as well as to facilitate their movement from one harvest area to another as needed. Both the federal and the state governments rely upon field worker recruitment and employment records to determine where field offices shall be located, the number of employees necessary to staff the various stations, and the amount of money to fund the project.

To argue that a supervisor has no duty to see to it that the basic statistics upon which the entire project is grounded are truthful, is to overlook both the purpose of the program and the duty of a supervisor. In fact, it appears that there is little other reason for having a supervisor in the position occupied by respondent.

Mr. Tieberg, then Director of the Department of Employment, testified that, as a result of obtaining information that false placement records of an employment service office in another state had been the subject of hearings held by a congressional subcommittee of the House Labor Committee, he caused to be issued Division Notice 3412N in November 1963, which emphasized that all "statistical reporting must at all

times be scrupulously accurate with strict adherence to all reporting standards and definitions.'' That notice also pointed out that while the department was anxious to expand its placement work, it wished to do so honestly rather than by ''gleaning extra statistics out of our present level of business.'' In December 1963, the notice issued at Tieberg's direction was discussed at a staff meeting at which Mr. Gubser was present. The importance of accurate reports was stressed and it was made clear that disciplinary action would be taken if there were false reports.

Subsequently, in May 1964, another Division Notice 3627Q was sent to all division offices. Again, the importance and necessity for truthfulness in reporting was emphasized, and an instance of an employee's dismissal for falsifying reports was cited. It was stated therein that ''we cannot permit the integrity of our agency and the entire employment security system to be damaged by willful falsification of reports by employees.'' Mr. Gubser was familiar with both of these notices.

The record reflects that the San Francisco office placement figures were inflated by ''three to one'' and that had there been honest reporting at the Union City farm office the number of placements reported would have dropped as much as 90 percent in some months. One of the methods respondent's subordinates used to inflate the figures was to visit a ranch, obtain the names of all workers there and take credit for placing them, even though they were not obtained through the office. Mr. Backus, manager of the office in Brentwood, testified that he brought this method of crediting placements in the field to the attention of Mr. Gubser, stating that he had been told the year before by some other person that it was ''perfectly all right,'' and Mr. Gubser said that was common practice or something like that, and said it was all right. The record reveals other instances where respondent told the staff workers they would have to ''light a lot of candles for this,'' and when placements were running behind to ''sharpen the pencil.''

The evidence supports the inference that respondent knew what was going on and that he was interested in keeping the placement figures high in order to maintain the number of subordinates under him and the number of offices he supervised. The subordinates were likewise interested in keeping their jobs and the money budgeted.

Since respondent's primary responsibility, as a Farm Labor

Supervisor I, was the active supervision of the local offices in his area, it seems to us a fragile argument that he was under no duty to verify reports submitted by his subordinates, by even a spot check, simply because no one specifically ordered him to do so. This would seem to be an inherent duty of supervising in the common understanding of the term ''supervisor,'' particularly where the Department of Employment, the state government, and the federal government all relied upon such reports to carry out the program. Nor can we, as respondent argues we should, excuse him for his failure to take any measures to verify the accuracy of the reports because others, too, failed in this duty.

Respondent, as supervisor, was under a duty to evaluate the performance of his subordinates and to recommend the number of subordinates or staff members needed for local offices. To perform this duty he required a reasonably accurate account of the volume of work to be handled by his subordinates in the various field offices he supervised. Inflated reports resulted in his recommending improper staffing of field offices.

The province of the superior court, as well as of this court in reviewing the action of the State Personnel Board, begins and ends with the determination whether there is substantial evidence to support the board's decision. Neither the superior court nor this court can reweigh the evidence; all legitimate and reasonable inferences must be drawn in favor of the findings of fact made by the board, not those made by the superior court, and the intervening judgment of the superior court does not change the nature of the review to be made by this court. (*Shepherd* v. *State Personnel Board*, 48 Cal.2d 41, 46 [307 P.2d 4]; *Sweeney* v. *State Personnel Board*, 245 Cal.App.2d 246, 251 [53 Cal.Rptr. 766].)

Respondent's contention seems to be that the evidence, which assertedly supports the board's decision, is not substantial. Substantial evidence has been defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion, that is, whether a fair and reasonable mind would accept it as probative of the issue. (*Consolidated Edison Co.* v. *National Labor Relations Board*, 305 U.S. 197, 229 [83 L.Ed. 126, 140, 59 S.Ct. 206]; *Houghton* v. *Loma Prieta Lbr. Co.*, 152 Cal. 574 [93 P. 377]; *Gerhardt* v. *Fresno Medical Group*, 217 Cal.App.2d 353, 361 [31 Cal.Rptr. 633].)

We believe that from the evidence related above a reasonable mind might well infer that respondent either knew or should have known that his subordinates were filing false

reports. It matters not that we might have come to a different conclusion had the decision been ours to make in the first instance, or that reasonable men might differ (as respondent argues) ; it is enough that a reasonable mind could reach the same conclusion that was reached by the appeals board.

The judgment is reversed, and the cause is remanded to the trial court with instructions to discharge its writ of mandate and enter judgment in favor of the State Personnel Board.

Conley, P. J., and Gargano, J., concurred.