[Civ. No. 37093. Second Dist., Div. Two. Apr. 6, 1971.]

SIDNEY WALKER III, Plaintiff and Respondent, v.
STATE PERSONNEL BOARD, Defendant and Appellant.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, and Lynn Henry Johnson, Assistant Attorney General, for Defendant and Appellant.

Harney, Ford & Schlottman and David M. Harney for Plaintiff and Respondent.

## Opinion

**FLEMING, J.**—The State Personnel Board appeals a judgment of the superior court setting aside the dismissal of Sydney Walker III, M.D., from his position as Psychiatric Resident II with the Department of Mental Hygiene's Neuropsychiatric Institute at the University of California at Los Angeles. The State Personnel Board found that Dr. Walker had been discourteous to fellow employees, and inefficient, within the meaning of Government Code section 19572 subdivisions (m) and (c).

■ The issue is whether the findings of the board were supported by substantial evidence. In determining the substantiality of evidence we must view the evidence in the light most favorable to the board and draw all legitimate and reasonable inferences in support of the Board's findings. (*Gubser* v. *Department of Employment*, 271 Cal.App.2d 240, 245 [76 Cal. Rptr. 577].)

*Discourtesy to Fellow Employees*

■ Contrary to the conclusion of the superior court, we find sufficient evidence in the record to support the board's finding that Dr. Walker had been discourteous to fellow employees (Gov. Code, § 19572, subd. (m)).

Dr. Gottlieb, a staff psychiatrist at the Neuropsychiatric Institute, supervised Dr. Walker. He testified that Dr. Walker attended meetings with psychology interns (subordinate trainees without medical degrees) on 5 September, 16 November, and 14 December 1967. At these meetings Dr. Walker displayed hostility to the interns, he spoke to them in an abrasive tone of voice, and his demeanor toward them was brusque.

Marvin Jacques, a student psychology fellow at the Neuropsychiatric Institute, was assigned to work as co-therapist with Dr. Walker. Jacques testified that in September 1967 at a meeting in Dr. Walker's office the latter said he wanted to introduce him to a therapy group as Dr. Jacques. Jacques did not have a doctor's degree and said he preferred to be introduced as Mr. Jacques. Dr. Walker shouted at Jacques, shifted and turned in his swivel chair, talked rapidly, and got up and down. Within a few days the two had a further discussion in Dr. Walker's office about the introduction of Jacques to the therapy group. Dr. Walker became even angrier than he had been on the previous occasion. He shouted at Jacques, grew red in the face, and had difficulty with his articulation. He said Jacques was trying to tell him how to handle his patients, and that Jacques should get it straight, "I am the doctor and these are my patients." Jacques reported these incidents to his supervisor.

Mrs. Carol Ellsberg, a psychology intern at the Neuropsychiatric Institute, worked with Dr. Walker. She testified that at a case conference Dr. Walker agreed to give a physical examination to one of the patients she was working with. Two weeks later she attended a conference at which Dr. Walker was present, and although she sat next to him for an hour and a half he said nothing about making arrangements for the physical examination. That afternoon Dr. Walker beckoned to her down the full length of a corridor, and after she had walked to the door of his office, he asked her why she had not made arrangements for the physical examination. She said she was sorry and would expedite things. Dr. Walker began shouting at her. He appeared very angry, his face was red, and he was gesticulating. He moved toward her and backed her up against the wall. Dr. Walker told her to notify the patient ahead of time to take a bath and put on clean clothes so he would not be subjected to unpleasant odors. She reported what had happened to her superior.

Dr. Ciesla, a psychiatric resident at the Neuropsychiatric Institute, confirmed this incident. He heard Dr. Walker shouting at Mrs. Ellsberg through the closed door of his office. Dr. Walker spoke in a loud and angry voice in a conversation that lasted three to five minutes. Mrs. Ellsberg was trying to calm Dr. Walker down. He could clearly hear the words spoken. He recalled the incident because it was unusual to hear noise through his closed door.

Although each particular act of discourtesy might be characterized as minor, we must consider them in the light of the record as a whole. (*Schneider* v. *Civil Service Com.*, 137 Cal.App.2d 277, 284 [290 P.2d 306].) In *Neely* v. *California State Personnel Bd.*, 237 Cal.App.2d 487 [47 Cal.Rptr. 64], a finding of discourteous treatment of a fellow employee was upheld where, on a single occasion, one employee used vulgar language in speaking to his superior employee. The several incidents here, with Dr. Walker gesticulating and shouting in unprovoked anger at startled co-workers, provide substantial support for a finding of discourteous treatment of fellow employees. We note as an aggravating factor that in each of the three cases Dr. Walker's discourtesy was directed toward persons who occupied positions inferior to his own in the medical hierarchy. The targets of his discourtesy were persons whose status would ordinarily preclude them from responding to a doctor's discourtesy in kind. We think those responsible for the orderly administration of public agencies would be neglectful of their duties if they failed to take steps to discipline a superior employee for discourtesy to inferior employees.

*Inefficiency*

We agree with the conclusion of the superior court that the record

contains no substantial evidence to support the board's finding that Dr. Walker was inefficient within the meaning of Government Code section 19572, subdivision (c).

The board found that Dr. Walker "failed to give reasonable attention to the appropriate dynamic psychological factors" in seven cases to which he had been assigned.

Dr. Walker received a B.A. degree in sociology from the University of California at Los Angeles in 1953. He studied physiology at the University of Southern California and pharmacology at the University of California Medical Center in San Francisco. He attended Hahnemann Medical College in Philadelphia and graduated from Boston University with an M.D. degree in 1964. He studied physical science at Queen Square in London on a grant from the National Institute of Health. He then interned in surgery at the University of Illinois, completing one year of residency in neurology at the University of Pittsburgh, and then transferring his studies to psychiatry. Part of his residency he performed at Harbor General Hospital, and in July 1967 he began his third year of psychiatric residency at the Neuropsychiatric Institute. In 1967 he published a book, "Psychiatric Signs and Symptoms due to Medical Problems."

From the record it clearly appears that Dr. Walker possesses a forceful personality. He differed (sometimes strongly) with his colleagues on the emphasis to be placed on investigation of possible organic defects as the origin of symptoms commonly associated with mental illness. One doctor testified that at the Neuropsychiatric Institute in only one of 30 cases could there be a legitimate suspicion of an organic basis for an emotional disorder. Dr. Walker would consider the possibility of an organic basis for mental illness in 30 to 40 percent of his cases.

The tenor of the charges of inefficiency against Dr. Walker is indicated by the written specifications explaining why his work had been unsatisfactory: ". . . the central theme that interferes with your work and which is stubbornly unchangeable and which makes your work as a psychiatric resident unacceptable by the standards of the Neuropsychiatric Institute is your underlying and unremitting belief that missed organic and structural brain changes are the cause of psychological distress and are the proper focus for intervention. Although at some time in the future we may find this to be true, it is the accepted body of belief in the psychiatric profession that mental life is a complex resultant of many factors and that psychic conflict is knowable in terms of psychological forces and that attention to these forces is therapeutic. Your beliefs are strongly antithetical to this and it seems almost as if you are trying to prove that psychological forces do

not exist. It is this one-sidedness that makes your performance as a psychiatric resident inadequate and unacceptable. . . ."

And to the same effect: ". . . the initial orienting meeting for the crisis clinic group was held sometime during the week prior to October 1, 1967. At this meeting you stated your views in a dogmatic, rigid, non-negotiable and absolutist manner. You conveyed alarm and dismay at the prospect of psychology interns being involved directly in the therapeutic contact with the patient. You conveyed your view that they were unqualified by virtue of not having a medical degree and they could not possibly function in any adequate sense without knowing the organic components of the patient's problems. Your teacher, Dr. Kardener, sought to encourage you to recognize this as a good learning experience for you in that it is the way of the 'real world' and there would be great value in improved patient care by having psychologist-psychiatrist consultation within an accepted frame of reference. You conveyed the meaning that this viewpoint was unacceptable to you but that you recognized you had no choice. You shrugged your shoulders, gave a look of distaste, and since it was the end of the session, you left the meeting."

And again to the same effect: "At the first crisis meeting held October 9, 1967, another psychiatric resident, Dr. Ira Casey, presented a case. You again displayed your tendency to over-emphasize physical factors and underemphasize psychological dynamic environmental factors. In a most overdetermined emphatic way your discussion focused not upon the traumatic environmental circumstances of the patient, her overt emotional distress, nor the dynamic understanding of her situation, but rather your discussion entirely focused upon the issue of whether she was currently menopausal or menstruating and if menopausal you wondered if there was sufficient emphasis on steroid replacement therapy in order to cure this patient's distress. This was a striking example of your inability to place such physical organic aspects in a more appropriate perspective with the remainder of the patient's life situation."

We find it intolerable that Dr. Walker's dismissal should be upheld because his views failed to conform to current theoretical dogma on the causes of mental illness. Yet the bulk of the evidence offered to show inefficiency related to the charge that Dr. Walker had not given "reasonable attention to the appropriate dynamic factors." Seven instances of this were cited by the board to substantiate its findings. These we have briefly summarized in an Appendix. Sufficient to say the record contains nothing to support the board's conclusion that Dr. Walker did not fully consider all relevant factors in treating his patients, nor does the record show that any patient suffered because of treatment received from Dr. Walker. Some witnesses

thought Dr. Walker failed to emphasize the "psychological dynamics" of his patients' illnesses. But there is no indication that he did not investigate these dynamics or did not understand them. Rather, the record suggests he was interested in aspects of his patients' illnesses in addition to their psychological dynamics. The medical opinion of an untrained subordinate is hardly substantial evidence to support a conclusion that Dr. Walker incorrectly treated a patient. And the opinions of the doctors who testified presented no more than bald conclusions as to Dr. Walker's inefficiency. As a psychiatric resident Dr. Walker was both doctor and student. Given the never-ending changes in the medical arts and the continuous development of new methods of treatment for mental illness, we do not believe the evidence supports a finding that Dr. Walker was inefficient within the meaning of Government Code section 19572, subdivision (c).

■   Thus, only part of the board's findings are supported by substantial evidence. The record does not indicate on which findings the board's dismissal of Dr. Walker was grounded. We think it unlikely the discipline imposed by the board would have taken so severe a form had the board realized that only the findings of discourtesy were supported by substantial evidence. Since we cannot tell what penalty the board would have imposed for discourtesy alone, whether discharge, or temporary suspension, or reduction in rank, or reprimand, we return the cause to the board for redetermination of the penalty. (*Cooper* v. *State Bd. of Medical Examiners,* 35 Cal.2d 242, 252 [217 P.2d 630, 18 A.L.R.2d 593]; see also *Stromberg* v. *California,* 283 U.S. 359, 367-368 [75 L.Ed. 1117, 1122, 51 S.Ct. 532].)

The judgment of the superior court is reversed, the decision of the State Personnel Board is vacated, and the cause remanded to the State Personnel Board with instructions to enter findings and conclusions in accordance with this opinion and determine the penalty it will impose for the acts of discourtesy set forth in the record.

Herndon, Acting P. J., and Compton, J., concurred.

Petitions for a rehearing were denied May 6, 1971, and appellant's petition for a hearing by the Supreme Court was denied June 23, 1971. McComb, J., and Burke, J., were of the opinion that the petition should be granted.

## APPENDIX

In the case of D.M., Dr. Walker examined the patient and wrote a consultation letter to the referring doctor. Dr. Walker's supervisors asked Dr. Walker to rewrite the letter because it did not present "an integrated way of looking at the problem" and was "very organic." The second draft of the letter was consistent with what the supervisors desired and equal in quality to letters written by other residents.

In cases No. 040-83-43 and No. 018-57-09, a social worker from the Neuropsy-

chiatric Institute testified she thought Dr. Walker should have been more considerate of the patients and should have hospitalized one of them.

In case No. 037-84-58, Dr. Walker asked a patient about a physical problem. Dr. Walker's supervisor later told Dr. Walker to "tune in" on the dynamics of the case.

At a conference at which another doctor presented a case for discussion, Dr. Walker asked about the patient's physical problems. Dr. Walker's supervisor concluded that Dr. Walker "did not grasp the dynamics" of the case.

In case No. 042-22-30, Dr. Walker "focused" on the patient's physical problem. His supervisor told him to explore other factors.

In case No. 018-57-09, Dr. Walker's supervisor felt he had focused on problems which were of academic rather than practical interest. Dr. Walker's attitude towards the patient was "aloof"; Dr. Walker appeared disheveled and put his feet up on a shelf while treating the patient. From this, one witness thought Dr. Walker to be "medically incompetent."