Filed 1/5/16  Cortina v. Cal. State Personnel Bd. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SALVADOR CORTINA,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CALIFORNIA STATE PERSONNEL BOARD,<br><br>  Defendant and Respondent;<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>  Real Party in Interest and Respondent. | H039531<br>(Monterey County<br>Super. Ct. No. M108566) |

Salvador Cortina appeals from the trial court's denial of his petition for a writ of administrative mandamus to compel the State Personnel Board (Board) to set aside its decision terminating his employment as a correctional sergeant for the Department of Corrections and Rehabilitation (CDCR).  Cortina was terminated for inexcusable neglect of duty (Gov. Code, § 19572, subd. (d))[1] and other failure of good behavior (§ 19572,

_____

[1] Further statutory references are to the Government Code unless otherwise specified.  Unspecified references to "subdivision" refer to subdivisions of Government Code section 19572.

subd. (t)).  He contends that the Board abused its discretion in sustaining the violation of subdivision (d) because there were no findings that the elements of the underlying crimes had been proven, there was no substantial evidence to support any such findings, and there was no finding that his violations of the law were intentional or grossly negligent. He contends that the Board abused its discretion in sustaining the violation of subdivision (t) because its factual findings were not supported by substantial evidence and even if they were, did not establish the required nexus between those actions and his employment.  We affirm.

## I.  Background

Cortina became a correctional officer in 2001 and was promoted to correctional sergeant in November 2007.

On November 21, 2007, he and five other men (Leobardo Rivas, Jose Rojo Rivas, Juan Pablo Tavarez, Fernando Rojo De La Cruz, and Luis Magana Villalobos)[2] went night hunting for rabbits on a cactus ranch outside Gonzales, California.  Cortina brought his seven-year-old son along.  The men met at Luis's house in Gonzales, and Cortina drove everyone to the ranch in his minivan.

Some of the men had their own rifles.  The others used borrowed rifles.  Some of the men appeared to be unfamiliar with the rifles and had to be shown how to use them. Some of the men consumed alcohol that night.

The minivan had no middle row of seats.  Cortina sat in the front passenger seat as Pablo drove the minivan on a dirt road perpendicular to the cactus furrows.  Two men sat in the open sliding door on one side and two sat in the open sliding door on the other side. The men "spotlighted out into the furrows" and when they caught sight of animals to

---

[2]     Because some of the men share surnames, we will refer to them by their first names to avoid confusion.

shoot, the men in the open door on that side of the minivan would sit down and shoot, while the two in the open door on the other side would stand up and shoot over the top of the minivan. Cortina would shoot out his window or across Pablo's chest and out Pablo's window.

Sometime after midnight, the men spotted a rabbit on the passenger side of the van. Luis stood up on the driver's side and fired across the top of the van. As Luis fired, Leobardo unexpectedly stood up on the passenger side and Luis accidentally shot him in the head.

Cortina had been dozing. He heard screaming and saw Jose "in panic mode." Cortina got out of the minivan and found Leobardo on the ground with blood coming out of his nose and mouth. Cortina collected the rifles and put them in the minivan. He and Fernando lifted Leobardo into the van. Leobardo "was dead weight." Cortina told Fernando to "sit him up" so he would not choke on his own blood. Cortina drove the minivan out of the cactus fields. When he reached the road, Cortina "started screaming" at the others to call 911. Jose tried to place the call but he was "nervous" and "[s]omehow, it was very difficult for me at the time to dial the numbers." Pablo also attempted to call 911. Cortina did not use his own phone to call 911.

The men wanted Cortina to drive directly to a hospital but Cortina thought it would be "safer" to return to town and call for an ambulance. He drove back to Luis's house. Someone reached the 911 dispatcher at 1:33 a.m. Cortina and Fernando placed Leobardo's lifeless body in the back of Luis's pickup truck, which was parked in Luis's driveway.

Cortina's son had gotten out of the minivan and was "crying a lot." At that moment, Cortina "heard a siren." He left immediately with his son and drove the minivan to his parents' house in Gonzales. He parked the minivan outside and took his son into the house.

Cortina took the rifles out of the minivan and put them in a spare bedroom.  His pants were wet and muddy and had blood on them so he changed them and threw the muddy ones in the laundry room.  When his brother asked what had happened, Cortina said "somebody got shot."  Cortina left the minivan at his parents' house, took his brother's car keys, and set off in his brother's car for Luis's house.  After he left, his brother washed the minivan and cleaned the blood from the inside.

Cortina was "kind of in a state of shock" and "ran off the road for, like, a minute or two minutes" because he "just couldn't stop crying."  He headed for his girlfriend's house but missed the freeway exit.  He was on his way back to town when somebody called him from his parents' house.  An officer met him there and took him into custody.

The record does not reveal precisely when Leobardo died.  Cortina testified that Leobardo was "dead weight" when he and Fernando lifted him into the minivan at the hunting site.  It is clear from the record that Leobardo was dead by the time the first officers arrived at Luis's house in Gonzales.  An autopsy recovered a bullet from Leobardo's skull.

The district attorney charged Cortina with involuntary manslaughter (Pen. Code, § 192, subd. (b)), discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3), felony child endangerment (Pen. Code, § 273a, subd. (a)), and misdemeanor destruction of evidence (Pen. Code, § 135).  The complaint was amended a year later to add counts for misdemeanor child endangerment (Pen. Code, § 273a, subd. (b)) and misdemeanor unlawful taking of game (Fish & G. Code, § 2000).  Cortina pleaded no contest to the latter two counts.  The trial court dismissed the remaining counts and placed Cortina on conditional probation for four years.

The criminal charges were still pending when the CDCR served Cortina with a notice of adverse personnel action terminating his employment effective January 31, 2008.  The grounds asserted were inexcusable neglect of duty (subd. (d)), discourteous treatment of the public or other employees (subd. (m)), willful disobedience

4

(subd. (o)), and other failure of good behavior either during or outside duty hours (subd. (t)). The notice described the "dangerous and illegal hunting expedition." It stated that Cortina's duties and responsibilities as a correctional sergeant included "the requirement that on or off duty conduct and behavior be law-abiding . . . ." It alleged that his conduct that night constituted (among other things) "involuntary manslaughter (Penal Code section 192(b), child endangerment (Penal Code Section 273a(a)) . . . and illegal taking of game (Fish and Game Code section[s] . . . 2000, 2005, 2006)." Cortina appealed the adverse action to the Board and requested a *Skelly*[3] hearing.

## A. *Skelly* Hearing

An administrative law judge (ALJ) conducted the hearing on November 12, 2009. The Board called three investigating officers, Cortina's young son, and Luis as witnesses. Cortina called his brother Alejandro (Alex), his cousin Jose, and Pablo as witnesses. Cortina testified in his own behalf.

Kelly McCoy was a Monterey County Deputy Sheriff in November 2007.[4] She went to Cortina's parents' house in the early hours after the shooting. She saw Alex come in "half-dressed" and "wet" from washing the minivan. A cursory search for weapons located "several rifles and shotguns" under a bedspread and additional rifles in the closet of another bedroom.

McCoy spoke with Cortina's young son for about 10 minutes. He told her that his father and his friends were drinking beers that night. A man was shot in the back of the head and when he did not get up, Cortina and others lifted the man into the minivan, took him to a house, and put him in the back of a pickup. His father said "they were going to

---

[3]      *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 197 (*Skelly*).

[4]      McCoy's supplemental police report was marked as an exhibit and admitted into evidence without objection.

take the man to the hospital later." His father drove him to his grandmother's house and asked Alex to wash the dirt and blood from the minivan.

Detective Alfred Martinez interviewed three of the hunters in Spanish.[5] Fernando told him that Cortina and Jose arranged the hunting trip. After Martinez recounted Fernando's description of the hunters' methods at the hearing, he was asked if he considered those methods safe. Martinez responded that he was "on the sheriff's SWAT team . . . . We would never train to shoot across our partner's chest in a vehicle with a long gun, or any gun, for that matter -- for sport." Shooting over the top of a vehicle knowing that there are individuals on the other side "might be a tactic I'd employ on the SWAT team, where we train that way, and there are a lot of safety measures built into that kind of training . . . ." "[B]ut for . . . lay people who are out shooting in the middle of the night with only the assistance of a spotlight and would've been drinking, as other people told me . . . it'd just be ludicrous to think that that would be anything but unsafe and looking for something bad to happen."

Martinez also interviewed Luis. Luis said he took aim after the men spotlighted something on the passenger side of the van. He saw a "shadow cross his sights" as he fired and realized that Leobardo had been hit. Luis told Martinez "that he really -- he wasn't a hunter, hadn't handled firearms very much in his life . . . ." Luis also claimed that he "couldn't drink because of some medications . . . but other individuals [including Leobardo] were drinking and they were drinking and shooting" that night. Martinez opined that this was "[a]bsolutely not" a safe procedure.

Martinez also interviewed Pablo, who contradicted Luis's assertion that Luis did not drink alcohol that night. None of the men that Martinez interviewed told him that Cortina consumed alcohol that night.

---

[5] Martinez's supplemental police report was marked as an exhibit and admitted into evidence without objection.

Martinez testified that Pablo told him that Cortina "seemed scared" when he left with his son and was "concerned that he didn't want to get involved in this -- being involved in a situation was not going to be a good thing and he needed to get his son home because of that."

Detective Martin Opseth was the lead investigator in the case.[6] He obtained consent to search Cortina's parents' house. He found rifles under a blanket in a bedroom and additional rifles in a closet. He interviewed Cortina's son, who told him that Alex "cleaned out the van, took the weapons out of the van, and told him not to tell anybody" and "not to say anything about what happened."

Opseth also interviewed Alex. Alex said he was at the hunting site "briefly in the beginning" but "thought that the participants were inexperienced and it was an unsafe situation." "So he left." Alex said he asked Cortina to leave with him but Cortina did not want to leave. Alex told Opseth that he "saw blood and mud on the van" when Cortina left it at their parents' house, so he washed it out.

Opseth interviewed Cortina, who told him that "he wasn't shooting at the time, so he knew it wasn't him." Cortina told Opseth that he was operating the spotlight when the fatal shooting occurred. He said the others wanted to take Leobardo directly to the hospital but he "decided that's not what he wanted to do." He admitted to Opseth that he left Luis's house, took the minivan and his son to his parents' house, removed the rifles from the minivan, and changed his pants.

Opseth was asked if Cortina told him "that he was concerned about his son being exposed to the weapons, being present with those around." Opseth replied that Cortina was concerned about his son "after the shooting, yes," but he "definitely didn't take any action before the shooting. I mean, they're shooting over the van, through the van . . . ."

---

[6] Opseth's supplemental police report was marked as an exhibit and admitted into evidence without objection.

7

"[T]hey were shooting all over the place" in the cactus fields. The ALJ asked Opseth if it was legal to do that and if the men had permission to be there. Opseth responded, "It's not legal to shoot at night, it's not legal to night hunt, and it's not legal to use a spotlight to hunt." "They were on private property. They had no permission to be on that property . . . ." "I think one or two of the guys there had worked there and had knowledge of the field, but nobody could show that they had any proof and I think we eventually contacted [the owners of the ranch]. They . . . did not give anybody permission to be shooting out there . . . ." It wouldn't matter even if they had permission because "[t]hey're still illegally hunting."

Cortina's cousin Jose testified that Leobardo worked at the ranch and had permission from his manager to hunt there. Jose did not drink alcohol that night. He did not recall Luis drinking alcohol, and he did not see Cortina drinking alcohol. He testified that Cortina was not operating the spotlight when the fatal shot was fired but was instead napping. Jose did not recall who was operating the spotlight.

Pablo testified that Cortina said he would be right back when he left with his son. Contradicting what he had told Martinez after the shooting, Pablo testified that Cortina did not say the shooting would cause him problems.

Alex testified that he went to the ranch around 11 or 12 that night and stayed about 20 minutes. He knew his brother was at the ranch because he had called him there earlier. Alex admitted that he "probably said it was unsafe." He maintained that he meant "in the matter of too many guys out there with rifles." "But they weren't being reckless or anything." Alex said he was drinking that night and had a 12-pack of beer with him. He ran into two guys "walking around with a flashlight . . . and they asked if I had beer and I gave them, like, two beers . . . ." Alex testified that Cortina did not tell him to clean the van; he did it on his own. He said their mother covered the rifles with a blanket.

8

Cortina did not recall Alex telling him that he should leave. He stated that he "wasn't a hunter that night" but when challenged, admitted firing his rifle 10-12 times during the course of the hunt. He denied firing it across Pablo's chest. He did not recall telling Ospeth that he was in the front passenger seat operating the spotlight when the fatal shot was fired. He testified that he never saw anything unsafe "other than after the fact, when I found out about Luis Magana, what he had done."

Cortina testified that he "was the person who took charge" after Leobardo was shot "because I knew this guy needed help." He admitted that he was trained in CPR but did not apply CPR. He had his cell phone with him but did not call for help "because I was driving." He did not drive directly to the hospital because the van had a bad tire and he thought it would be "safer" to drive to Luis's house. He admitted knowing that law enforcement is notified whenever a gunshot victim turns up in the ER. "Oh, that's a given, yes." "[W]hen it's a gunshot, yeah, it's automatic."

Cortina testified that he did not know that hunting with a spotlight is illegal. He admitted knowing that it is illegal under the Fish and Game Code to shoot at night without a permit.

The ALJ issued a proposed decision sustaining Cortina's termination for inexcusable neglect of duty (subd. (d)), willful disobedience (subd. (o)), and other failure of good behavior (subd. (t)). With respect to the subdivision (d) charge, the ALJ noted that "[p]eace officers must act responsibly and within the scope of the criminal law, whether on or off duty." The ALJ concluded that "the evidence established that [Cortina] participated in illegal hunting and endangered his son in violation of the criminal law. [Cortina] acted unethically and outside the scope of the law. He has a duty as a peace officer to act responsibly and ethically both on and off duty. [Cortina] was negligent in his failure to exercise due diligence in his performance as a Correctional Sergeant. Thus, [the CDCR] has established that [Cortina] neglected his duty in a manner that constitutes a violation of . . . subdivision (d)."

9

With respect to the subdivision (t) charge, the ALJ explained that subdivision (t) requires "more than mere misconduct." "[T]he 'misconduct must bear some rational relationship to [the employee's] employment and . . . must be of such character that it can easily result in the impairment or disruption of the public service.'" The ALJ noted further that "[t]he courts have consistently held that peace officers are held to a higher standard of behavior than non-peace officers [citation] and that peace officers may be disciplined for off-duty violations of the criminal laws. [Citation.]" The ALJ found "a clear nexus" between Cortina's conduct and his position as a correctional sergeant because his job requires him to "exercise[] control of adults who have been committed to an institution for criminal behavior." "In addition, [Cortina's] irrational conduct, when faced with the accidental shooting . . . , and his irresponsible behavior in tampering with the evidence, reflected poorly on his position . . . . As a trained peace officer, [Cortina] had a responsibility to remain calm under the circumstances, take charge, and take appropriate action. By failing to obtain medical assistance for the victim, failing to drive the victim to a hospital, failing to report the incident to the police, leaving the scene, removing evidence from the van, changing his pants, leaving the van which resulted in evidence being washed away, and not returning immediately to the scene, [Cortina] demonstrated poor judgment and failed to exercise appropriate discretion and responsibility." The ALJ concluded that Cortina's actions "reflected poorly on, and caused discredit to" himself and to the CDCR. "Therefore, [the CDCR] has established that [Cortina] violated . . . subdivision (t)."

## B. The Board's Decision

The Board adopted the ALJ's recommended decision in large part. It sustained Cortina's dismissal for violations of subdivisions (d) and (t) but took exception to the ALJ's conclusion that Cortina's no contest pleas constituted willful disobedience under subdivision (o). Cortina petitioned for rehearing. The Board denied the petition.

10

### C. Trial Court Proceedings

Cortina petitioned the trial court for a writ of administrative mandamus, arguing among other things that no substantial evidence supported the Board's findings. In a written statement of decision, the court ruled that the Board's decision was supported by substantial evidence and that the penalty of dismissal was not an abuse of the Board's discretion. The court entered judgment denying Cortina's petition "in its entirety." Cortina timely appealed from the judgment.

### II. Discussion

### A. Standard of Review

Code of Civil Procedure section 1094.5 governs inquiries "into the validity of any final administrative order or decision made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer . . . ." (Code Civ. Proc., § 1094.5, subd. (a).) When a vested, fundamental right such as the right of an employee to continued employment is at issue, the trial court "must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence." (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

On appeal from the trial court's denial of a writ of administrative mandamus, "we review the record to determine whether substantial evidence supports the trial court's conclusions . . . ." (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 45; see

11

*Fukuda*, *supra*, 20 Cal.4th at p. 824.) "'"We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision. [Citations.] Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's. [Citation.]"'" (*Lake v. Reed* (1997) 16 Cal.4th 448, 457.)

## B. Inexcusable Neglect of Duty

Cortina contends that the Board abused its discretion in sustaining the violation of subdivision (d). Subdivision (d) provides that "inexcusable neglect of duty" constitutes cause for discipline of an employee. The Board defines the phrase to mean "the intentional or grossly negligent failure to exercise due diligence in the performance of a known official duty." (*In the Matter of the Appeal by E.W.* (1999) SPB Dec. No. 99-09, p. 19; see *Gubser v. Dept. of Employment* (1969) 271 Cal.App.2d 240, 242-243 (*Gubser*).)

"Peace officers must act responsibly and within the scope of the criminal law, whether on or off duty." (*In the Matter of the Appeal by J.R.* (1993) SPB Dec. No. 93-04, p. 5.) "It is not unreasonable for a law enforcement agency to forbid and discipline for off-duty conduct by its officers which violated the penal laws." (*Gillies v. Civil Service Bd.* (1979) 99 Cal.App.3d 417, 419 (*Gillies*).) "'Peace officers may be disciplined, including termination of employment for violating laws they are employed to enforce.'" (*Hooks v. State Personnel Bd.* (1980) 111 Cal.App.3d 572, 577.)

Here, Cortina acknowledges that "illegal conduct is, on its own, a valid basis for discipline" under section 19572. He complains, however, that the Board's conclusion that he participated in illegal hunting and endangered his son in violation of the criminal law lacked evidentiary support because the Board did not expressly find the elements of those crimes proven by a preponderance of the evidence, and there was no substantial evidence to support any such findings. We disagree.

"'"In following the substantial evidence rule we are obligated to consider the evidence in the light most favorable to the Board, giving to it the benefit of every reasonable inference and resolving all conflicts in its favor." [Citation.] "Inferences based upon circumstantial evidence are sufficient to support a finding." [Citation.]'" (*Catricala v. State Personnel Bd.* (1974) 43 Cal.App.3d 642, 649 (*Catricala*).) Here as we will conclude, the Board's determination that Cortina violated the criminal law was supported by its findings, which included implicit findings that the elements of the underlying crimes were proven. (See *Catricala*, at pp. 648-649.)

## 1. Violations of the Fish and Game Code

Fish and Game Code section 2000 provides in pertinent part that it is "unlawful to take any . . . mammal . . . except as provided in this code or regulations made pursuant thereto." Fish and Game Code section 2002 makes it "unlawful to possess any . . . mammal . . . taken in violation of any of the provisions of this code, or of any regulation made under it." Fish and Game Code section 2005 makes it "unlawful to use an artificial light to assist in the taking of . . . game mammals . . . ." (Fish & G. Code, § 2005, subd. (a).) That section also makes it unlawful "to throw or cast the rays of any spotlight, headlight, or other artificial light . . . in any field, woodland, or forest where game mammals . . . are commonly found, or upon any game mammal . . . , while having in his or her possession or under his or her control any firearm or weapon with which that mammal could be killed, even though the mammal is not killed, injured, shot at, or otherwise pursued." (Fish & G. Code, § 2005, subd. (b).)

Here, the Board expressly found that "[o]n the evening of November 21, 2007, [Cortina] and five other adults . . . went hunting for rabbits . . . ." (Finding of Fact 2.) "The group hunted from [Cortina's] van using a spotlight to illuminate the rabbits. While traveling around in the fields, one individual would put the spotlight on the rabbit, and another individual would . . . use a rifle to shoot at the rabbit, and another individual would stand on the running board of the van and use a rifle to shoot at the rabbit over the

13

roof of the van from the opposite side." (Finding of Fact 3.) The Board also stated that Cortina "admitted at [the] hearing that he knew that he could not shoot game at night without a license."

Substantial evidence supported these findings. It was undisputed that the group went hunting for rabbits at night with a spotlight. There was evidence that Cortina organized the hunt and drove everyone to the cactus ranch. Cortina admitted that he shot his rifle that night. "I would see a rabbit. I'd exit the van. I'd shoot . . . ." The others also shot their rifles. There was evidence that the hunt was successful. Cortina's son told Opseth that the group killed several rabbits during the hunt. There was also evidence that Cortina possessed the game. Alex testified that he saw blood in the van "under the bag with the rabbits" and that he took "the rabbits" out of the minivan after Cortina left it at their parents' house. Finally, there was evidence that Cortina knew that he and the group were violating the Fish and Game Code. Cortina testified that he did not know that using a spotlight was illegal. But as the Board noted, he "admitted at the hearing that he knew that he could not shoot game at night without a license."

The foregoing evidence was sufficient to establish violations of Fish and Game Code sections 2000 and 2002. Cortina argues, however, that even if there was sufficient evidence to establish the elements of the underlying offenses, there was no evidence apart from his no contest pleas to establish that his violation of the criminal law was "'intentional or grossly negligent'" as subdivision (d) requires. (*Gubser*, *supra*, 271 Cal.App.2d at pp. 242-243.) We disagree.

With certain exceptions that do not apply here, a no contest plea to a misdemeanor cannot be used in an administrative disciplinary proceeding. (*County of Los Angeles v. Civil Service Com.* (1995) 39 Cal.App.4th 620, 628-629 (*County of L.A.*); see *Cartwright v. Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 773; Pen. Code, § 1016, subd. (3).) However, that does not advance Cortina's argument because the record refutes his assertion that the subdivision (d) violation was upheld "solely" based on his no

14

contest plea. As the Board expressly found, Cortina "admitted at the hearing that he knew that he could not shoot game at night without a license." Thus, substantial evidence supported the Board's conclusion that Cortina intentionally or with gross negligence violated a known duty by "participat[ing] in illegal hunting . . . in violation of the criminal law." This provided a sufficient basis to sustain the violation of subdivision (d). (*Gillies*, *supra*, 99 Cal.App.3d at p. 419.)

## 2. Child Endangerment

We reach a different conclusion with respect to the Board's determination that Cortina intentionally or with gross negligence violated a known duty by "endangering his son . . . in violation of the criminal law." We need not address whether the evidence supported the Board's implicit finding that the elements of the child endangerment statute were satisfied because even if they were, there was no evidence apart from his no contest plea to misdemeanor child endangerment that Cortina intentionally or with gross negligence violated that law. To the extent the Board relied on Cortina's no contest plea, that reliance was improper. (*County of L.A.*, *supra*, 39 Cal.App.4th at pp. 628-629; Pen. Code, § 1016, subd. (3).) However, this does not mean that the trial court abused its discretion in sustaining the violation of subdivision (d). As we have explained, the violation of subdivision (d) was properly sustained because sufficient evidence supported the Board's conclusion that Cortina intentionally or with gross negligence violated the Fish and Game Code.

## C. Other Failure of Good Behavior

Cortina contends that the Board abused its discretion in sustaining the violation of subdivision (t) because there was no substantial evidence of a nexus between his actions that night and his employment. We disagree.

Subdivision (t) provides that "[o]ther failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing

authority or the person's employment," constitutes cause for discipline of an employee. Subdivision (t) is "'a catchall to include situations and acts which do not easily fit into the [24] specific causes'" enumerated in section 19572. (*Nightingale v. State Personnel Board* (1972) 7 Cal.3d 507, 512 (*Nightingale*).) It "refers to conduct which would reflect discredit on the employing agency or the position held by the person engaging in such conduct." (*Orlandi v. State Personnel Bd.* (1968) 263 Cal.App.2d 32, 37 (*Orlandi*).) "[S]ubdivision (t) does not require 'that the employee be convicted of a crime [or] that it appear that [his] actions . . . [were] illegal.'" (*Anderson v. State Personnel Bd.* (1987) 194 Cal.App.3d 761, 768 (*Anderson*).) The misconduct need not be expressly proscribed by rule. (*Orlandi*, at p. 40 ["Inherent in the position of a patrolman is his knowledge, without being told, that 'fixing a ticket' is a violation of good behavior and one which would bring discredit upon himself and the department."].) Nor does it have to be "publicly known, resulting in actual discredit to the agency." (*Nightingale*, at pp. 513-514.) "'If the misconduct bears some rational relationship to the employment and is of a character that can reasonably result in the impairment or disruption of public service,' the employee may be disciplined." (*Johnson v. County of Santa Clara* (1973) 31 Cal.App.3d 26, 32; *Anderson*, at pp. 769-770.)

Here, the Board found "a clear nexus" between Cortina's conduct that night and his employment on several grounds. His criminal conduct provided one nexus because "as a correctional sergeant, [Cortina] exercises control of adults who have been committed to an institution for criminal behavior." Cortina concedes that substantial evidence supported the finding that his job required him to exercise control of inmates. He does not challenge the existence of a nexus between his criminal conduct and his employment as a correctional sergeant. Nor could he. It is well-settled that the commission of off-duty crimes establishes a nexus between a peace officer's duties and his or her off-duty conduct for purposes of subdivision (t). "[W]illfully breaking the law . . . is entirely inconsistent with . . . the duties of a sworn peace officer" and "can be

16

found to be conduct which has or is likely to have harmed the public service and . . . cause[d] discredit to the . . . [person's] employment." (*Ramirez v. State Personnel Bd.* (1988) 204 Cal.App.3d 288, 294 (*Ramirez*).)

The Board found that Cortina's "irrational conduct" immediately after the shooting and his "irresponsible behavior in tampering with the evidence" provided another nexus to his employment. Cortina does not challenge the facts underlying the Board's findings. On the contrary, he concedes that "many" of those facts are true. He complains, however, that the Board abused its discretion in finding a nexus between his conduct and his job because it failed to make an express finding that he tampered with or removed evidence.

The argument lacks merit. As we have already explained, we review the evidence in the light most favorable to the Board's findings and indulge all reasonable inferences in support thereof. (*Catricala*, *supra*, 43 Cal.App.3d at pp. 648-649.) Here, there was more than sufficient evidence to support an implied finding that Cortina tampered with and removed evidence. He left the scene and took the van to his parents' house. (Finding of Fact 7.) He removed the guns from the van and put them in his parents' house. (Finding of Fact 8.) He removed his bloody pants and threw them into his parents' laundry room. (Finding of Fact 8.) He left the van at his parents' house, which resulted in his brother washing away evidence. (Finding of Fact 10.) There was evidence that before he left in the van, he told those who remained at the scene "that this [situation] would cause too many problems for him." He did not return immediately to the scene after he left his parents' house. A reasonable factfinder could conclude from all of this evidence that Cortina was trying to hide something and/or to evade questioning. Thus, substantial evidence supported the Board's implicit finding that Cortina tampered with the evidence.[7]

_____

[7] As Cortina acknowledges, this conclusion means that we need not reach his additional argument that there was no nexus between his conduct and his job because the

17

Cortina next complains that no substantial evidence supported the Board's finding that he had a responsibility as a trained peace officer to remain calm under the circumstances, take charge, and take appropriate action. We disagree. The Board found that Cortina's job specifications included "the following relevant tasks: [¶] Supervises the work of Correctional Officers in the safe custody, discipline, and welfare of inmates or parolees on an assigned watch or in a major area; . . . develops procedures and posts orders; provides on-the-job training for Correctional Officer staff; promotes acceptable attitudes and behavior of inmates; . . . reports infractions of rules and regulations and irregular or suspicious occurrences and takes or recommends appropriate action; . . . prepares employee and performance reports; . . . ." Implicit in these specific obligations is the general obligation to remain calm under the circumstances, take charge, and take appropriate action. Cortina acknowledged as much when he emphasized at the hearing that he "was the person who took charge" after Leobardo was shot. He also emphasizes on appeal that he "took the initiative" after Leobardo was shot and "went into action" while the others "panicked."

Cortina next complains that the Board's findings that he acted irrationally and irresponsibly, demonstrated poor judgment, and failed to exercise appropriate discretion were "based on arbitrarily drawn inferences which unexplainably ignore certain portions of the record." The argument misperceives our task as a reviewing court. It is not our task to determine whether substantial evidence supports Cortina's view of the evidence. Under the substantial evidence test, "[w]e review the [B]oard's decision in light of the entire administrative record. [Citation.] Our standard is whether the record discloses substantial evidence (reasonable, credible, and of solid value) such that a reasonable trier

fact that he "panicked when his friend was shot" and did not handle the situation well "does not discredit the CDCR in any way." That argument "assumes that this Court does not find substantial evidence to support [the finding] that [he] intentionally tampered with or removed evidence."

18

of fact could have found as it did." (*Parker v. State Personnel Bd.* (1981) 120 Cal.App.3d 84, 87.)  We have determined that the Board's conclusions were supported by its findings and that its findings were supported by substantial evidence.  Thus, the trial court did not abuse its discretion when it upheld the Board's decision and denied Cortina's petition for a writ of administrative mandamus.

### III.  Disposition

The judgment is affirmed.

 

_____

Mihara, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Grover, J.